duUNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JENNIFER H.,[1]

                        Plaintiff                        DECISION and ORDER

-vs-

                                                 6:21-CV-6234 CJS

COMMISSIONER OF SOCIAL
SECURITY,

                         Defendant.

_____

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the applications of Plaintiff for Social Security Disability Insurance ("SSDI") benefits and Supplemental Security Income ("SSI") benefits.   Now before the Court is Plaintiff's motion (ECF No. 14) for judgment on the pleadings and Defendant's cross-motion (ECF No. 16) for the same relief.   For the reasons discussed below, Plaintiff's application is granted, Defendant's application is denied, and this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order.

## STANDARDS OF LAW

The Commissioner decides applications for disability benefits using a five-step sequential evaluation process:

A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R.

_____

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

§§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[2]  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform. The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.[3]

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant

---

[2] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

[3] "The Commissioner's burden at step five is to show the existence of possible employment for an individual with the RFC determined by the ALJ in the fourth step of the sequential analysis." *Smith v. Berryhill*, 740 F. App'x 721, 726–27 (2d Cir. 2018) (citation omitted). The ALJ typically does this either by resorting to the medical vocational "grids" or by taking testimony from a vocational expert. *See, Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) ("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines. A more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.").

part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ[)"]. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude

> otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012)
> (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece
> of evidence submitted, and the failure to cite specific evidence does not indicate
> that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted); *see also, Schillo v. Kijakazi*, 31 F.4th 64, 74 (2d Cir. 2022) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.   The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*.") (emphasis in original, citations and internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).   "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the factual and procedural history of this action.

The Court will refer to the record only as necessary to rule on the alleged errors identified by Plaintiff.

Plaintiff claims to be disabled due to a combination of physical and mental impairments, but the instant action focuses on the Commissioner's evaluation of the mental impairments and, in particular, on her evaluation of the medical opinion evidence concerning the severity of those impairments.

Applying the five-step sequential evaluation, the ALJ found, in pertinent part, that Plaintiff had severe impairments consisting of asthma, bipolar disorder, borderline personality disorder, and post-traumatic stress disorder ("PTSD"),[4] along with non-severe physical impairments, which, either singly or combined, did not meet or medically-equal a listed impairment.   The ALJ further found that, physically, Plaintiff had the RFC to perform medium work, with some postural and environmental limitations, and that, "[m]entally, she is capable of performing simple, routine, and repetitive tasks in low-stress work environments (defined in this context as jobs having only occasional decisionmaking and occasional changes in the work setting).   The claimant can have occasional contact with coworkers and supervisors but no contact with the public." (Tr. 18).[5]   The ALJ further found that with such RFC, Plaintiff was unable to perform any past relevant work, but was able to perform other jobs existing in significant numbers in the national economy, and that she was therefore not disabled.[6]

The ALJ broadly summarized his decision by stating that, "the evidence does establish a history of mental disorders affecting [Claimant's] ability to function but these disorders cause

---

[4]  The record indicates that Plaintiff suffered sexual abuse as a child and was raped as an adult.
[5]  Unless otherwise noted citations are to the administrative record.
[6]  At step five the ALJ relied on the testimony of a vocational expert ("VE").

no more than mild effects on her understanding and only moderate effects on her ability to function in other areas."[7]

In arriving at the conclusion that Plaintiff was not disabled, the ALJ evaluated medical opinion evidence from both treating and non-treating sources.   Because Plaintiff's claims were filed prior to March 27, 2017, the ALJ was required to apply the Commissioner's "old" regulations concerning the evaluation of medical opinion evidence, including the "treating physician rule," which will be discussed further below.   The ALJ, though, did not expressly refer to the treating physician rule or explicitly evaluate the factors thereunder.   Nevertheless, the ALJ evaluated and assigned weight to the various medial opinions.

The ALJ found that the opinions of treating psychiatrists Mary Nobilski. M.D. ("Nobilski") and Brian Babiak, M.D. ("Babiak"), both of which indicated that Plaintiff had functional limitations that would preclude full-time competitive employment, were entitled to "some weight" and "limited weight," respectively.[8]   Meanwhile, the ALJ found that the contrary opinions of two non-treating sources were entitled to "great weight" and "considerable weight," respectively. Specifically, the ALJ found that the opinion of consultative psychologist Brett Hartman, Psy.D. ("Hartman"), who examined Plaintiff once, on January 19, 2017, was entitled to "great weight," and that the opinion of agency review psychologist T. Harding, Ph.D. ("Harding"), who never examined Plaintiff, was entitled to "considerable weight." (Tr. 22-23).

In making those determinations concerning the medical opinion evidence, the ALJ first reviewed and summarized the entire medical record, accurately noting that Plaintiff's symptoms

---

[7] Tr. 12.
[8] Hartman's report is dated January 19, 2017 (Tr. 629), and Harding's report is dated January 24, 2017. (Tr. 85). Nobilski's report is dated August 1, 2017. (Tr. 779-782).   Babiak's report is dated November 20, 2018. (Tr. 978).

fluctuated at times, and that there was evidence that both supported and detracted from Plaintiff's claim of disability.  For example, the ALJ discussed Plaintiff's subjective complaints and the notations contained in various treatment records relating to her severe mental impairments.  The ALJ provided a fairly comprehensive overview of both Plaintiff's subjective complaints and the overall record.

The ALJ, though, went on to conclude that Plaintiff's subjective complaints, and the medical opinions from Nobilski (along with treating clinical therapist Erin Jerome ("Jerome") and Babiak, were not entirely consistent with the record overall, and overstated Plaintiff's limitations.

Regarding the consistency of Plaintiff's complaints with the medical evidence generally, the ALJ found, for example, when considering Plaintiff's ability for "adapting or managing oneself" under the "paragraph B" criteria at the third step of the sequential evaluation, that there was evidence of Plaintiff's increased stress and anxiety, including "a history of inpatient treatment for decompensation."  However, the ALJ found that Plaintiff's limitation was only "moderate" since the record showed that Plaintiff had "periods of improved mood stability, even with persistent difficulty interacting with others," and that Plaintiff "could generally manage money" and "perform most household tasks including cooking, cleaning and laundry." (Tr. 18). Additionally, when considering the "paragraph C" criteria at the third step of the sequential evaluation, the ALJ found that Plaintiff did not satisfy such criteria, since "the record show[ed] enrollment in cosmetology classes during the period at issue," which he found "show[ed] some ability to adapt to increased mental demand without decompensation." (Tr. 18).

Regarding Dr. Babiak, who concluded that Plaintiff would be off-task more than a third of each workday and would miss more than three days of work per month, the ALJ assigned it

"limited weight" since the record contained no treatment notes from Babiak to support the opinion, and since two treatment notes from other treatment providers, in June and August 2017, showed "normal mentation, speech, and movements despite some anger, inconsistent with the marked and extreme limitations Dr. Babiak provide[d]." (Tr. 22).

Regarding the missing treatment notes from Babiak, the record indicates that Plaintiff began treating with Babiak on or about September 1, 2018, after leaving treatment with Nobilski and Jerome. (Tr. 978).   Consequently, by the time of the administrative hearing on December 17, 2018, Plaintiff had been treating with Babiak for several months.   However, Babiak's treatment notes are missing from the record.   Plaintiff's counsel and the ALJ had a discussion concerning certain missing records, presumably referring to the notes from Babiak, and the ALJ agreed to leave the record open for fourteen days.   However, it does not appear that Plaintiff's counsel ever provided the ALJ with any additional records, [9] leaving Babiak's functional assessment dated November 20, 2018, unsupported.

As for Nobilski and Jerome, who concluded that Plaintiff's mental health symptoms would "constantly interfere" with attention, concentration, and sleep, and cause Plaintiff to miss more than four days of work per month, the ALJ assigned it "some weight," observing that an examination in April 2017 had showed "normal mood, memory and concentration inconsistent with the marked limitations in concentration and interaction with coworkers" found therein. (Tr. 22).

Plaintiff appealed the ALJ's determination, but the Appeals Council declined to review the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner.

---

[9] *See*, ALJ's Decision and Order, indicating that Plaintiff's counsel did not submit additional records. (Tr. 13).

In this action, as discussed further below, Plaintiff maintains that the Commissioner's decision was erroneous and must be reversed.   Plaintiff takes issue with almost every aspect of the ALJ's decision, asserting that "no reasonable person [could] read Plaintiff's psychiatric treatment records and conclude that she is capable of substantial gainful activity on a regular and continuing basis,"[10] and that the ALJ's decision "does not properly assess the opinions of record, does not give the treating sources the proper weight and engages in one of the most significant cherry picking and unsubstantiated inferences [sic] of any decision that th[e] Court will see."[11]

More specifically, Plaintiff first contends that the ALJ's evaluation of the treatment records failed to properly consider "the longitudinal evidence" and instead "pick[ed] out isolated instances [of normal or improved functioning] without considering Plaintiff's overall functioning."[12]   Plaintiff also maintains that the ALJ drew improper inferences from certain facts, such as the fact that Plaintiff had "several interruptions in treatment, including poor therapy and psychiatric attendance and periods without medications."[13]   Plaintiff contends that the ALJ improperly inferred from these facts that Plaintiff's condition was not as severe as she claimed, without first following the requirements of Social Security Ruling ("SSR") 16-3p, which provides that an   ALJ

---

[10] Pl. Memo of Law, ECF No. 14-1 at p. 3.   The reader is advised that the electronic case filing ("ECF") page number appearing at the top of an electronically-filed document does not always match the page number appearing in the document.

[11] Pl. Memo of Law, ECF No. 14-1 at p. 3.

[12] Pl. Memo of Law, eCF No. 14-1 at p. 8; *see also, id.* at p. 14 ("The ALJ cites an October 2017 record (Ex. 18F/18) (Tr. 923) stating that Plaintiff had a euthymic mood and intact thought process.   At the sake of repetition, all of the ALJ's points might be appealing in a vacuum but ignore [Plaintiff's] overall longitudinal functioning."); p. 15 ("[W]hile the ALJ is able to pick out a few negative [(meaning not supportive of Plaintiff's claim)] things here and there, Plaintiff's overall functioning clearly evidences someone with severe, rapid cycling psychiatric symptoms.").

[13] Pl. Memo of Law, ECF No. 14-1 at p. 15.

"will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."[14] Additionally, Plaintiff contends that the ALJ improperly relied on evidence of Plaintiff's performance of certain activities of daily living to find that her symptoms were not as severe as she claimed, without evaluating whether performance of those activities was actually indicative of the ability to work on a sustained basis.[15]

Plaintiff further maintains that the ALJ failed to properly evaluate the medical opinion evidence.   In that regard, Plaintiff argues that the ALJ failed to mention the "treating physician rule" and did not properly apply the rule in any event since he failed to provide "good reasons" for the weight that he assigned to the medical opinions.   Plaintiff notes, for example, that when weighing the treating opinion of Nobilski, the ALJ did not discuss the so-called "*Burgess*" factors.[16]   Plaintiff further asserts, *inter alia*, that in assigning greater weight to the opinions of Hartman and Harding than he did to the opinions of Nobilski and Jerome, the ALJ cherry-picked evidence that did not accurately reflect Plaintiff's longitudinal treatment record.

Additionally, Plaintiff asserts that the ALJ's RFC finding concerning Plaintiff's ability to interact with co-workers, supervisors, and the public, is arbitrary and not supported by substantial evidence.[17]   And, finally, Plaintiff contends that the VE's testimony did not provide

---

[14] Pl. Memo of Law, ECF No. 14-1 at p. 15 (quoting SSR 16-3p).

[15] Pl. Memo of Law, ECF No. 14-1 at pp. 16-17 ("[T]hese activities (even if relevant, which is doubtful) are [not] performed with a degree of frequency or on a sustained basis consistent with full-time competitive work (i.e., 8 hours per day, 5 days per week, without being off task more than 10% of the day or skipping more than one day [of work per month].").

[16] Referring to *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008).

[17] Plaintiff argues that the ALJ's RFC finding limiting her to no contact with the public had no basis.   However, Plaintiff specifically testified that she preferred not to be around people at times, including strangers. (Tr. 62).

substantial evidence to support the ALJ's step-five finding since it was not based on a hypothetical question that accurately reflected Plaintiff's RFC.   That is, Plaintiff contends that since the ALJ's RFC finding was inaccurate due to legal error, the VE's testimony in response to a hypothetical question restating that RFC finding did not provide substantial evidence that Plaintiff can perform other jobs.

Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence.   For example, Defendant denies that the ALJ cherry-picked evidence and contends that the ALJ conducted a "balanced discussion of the evidence, which included direct citations to, and discussion of, many of the items of evidence [Plaintiff] claims [the ALJ] overlooked."[18]   Defendant further contends that the evidence did not uniformly favor Plaintiff, and that the ALJ "cited to numerous examples of generally unremarkable mental status findings to support his conclusion that Plaintiff largely retained the ability to perform the requirements of the RFC on a consistent basis."[19]   Defendant further maintains that, contrary to what Plaintiff alleges, the ALJ did "not fault Plaintiff for her inconsistent follow up and treatment."[20]   Further, Defendant asserts that it is proper for an ALJ to consider a claimant's activities of daily living, provided that he does not overstate them, and that the ALJ here properly explained why evidence of Plaintiff's daily activities supported his finding that Plaintiff was not disabled.[21]

Defendant also contends that when weighing the medical opinion evidence, the ALJ

---

[18] Def. Memo of Law, ECF No. 16-1 at p. 7.
[19] Def. Memo of Law, ECF No. 16-1 at p. 9; *see also, id*. at p. 11 ("[C]ontrary to Plaintiff's arguments, the ALJ acknowledged the up-and-down nature of Plaintiff's impairments throughout the record[.]").
[20] Def. Memo of Law, ECF No. 16-1 at p. 11.
[21] Def. Memo of Law, ECF No. 16-1 at p. 15.

provided good reasons for his findings.   Defendant states, for example, that when weighing Dr. Nobilski's treating opinion, the ALJ considered all the evidence, but nevertheless, "concluded overall that the record as a whole did not fully support the opinion, specifically noting Plaintiff's reports of stability and unremarkable mental status findings[.] (Tr. 22; 416-17, 419, 423, 631-32, 814, 822, 832-33, 923, 93[0]-31, 952 (mental status findings), Tr. 506, 821, 876 (evidence of improvement/stability)."[22]   Defendant further states that while the ALJ may have only cited particular evidence to support the weight he assigned to a medical opinion, the Court must not focus solely on that evidence but, rather, must read the ALJ's decision "as a whole."[23]   Defendant further contends that the ALJ's finding concerning Plaintiff's ability to interact with co-workers, supervisors, and the public, is supported by substantial evidence.

Plaintiff filed a reply brief in which she emphasizes that the ALJ failed to properly evaluate the "primary issues" in this action, which are "whether she can meet employer demands of staying on task and/or [maintaining] attendance."[24]   Plaintiff also asserts, in response to Defendant's cross-motion, that insofar as Defendant claims that Plaintiff's condition improved significantly in or about July 2018, the ALJ failed to consider whether she was entitled to a closed period of disability, "up and through any claimed date of improvement."[25]

The Court has carefully reviewed and considered the administrative record and the parties' submissions.

---

[22] Def. Memo of Law, ECF No. 16-1 at p. 19.
[23] Def. Memo of Law, ECF No. 16-1 at p. 20.
[24] Plaintiff Reply, ECF No. 17 at p. 1.
[25] Plaintiff Reply, ECF No. 17 at pp. 6-7.

DISCUSSION

<u>The ALJ's Evaluation of the Medical Opinion Evidence</u>

The instant case contains medical opinion evidence from treating sources which, if given controlling weight, would establish that Plaintiff is incapable of performing the mental demands of even simple unskilled work since, for example, she would be unable to exhibit sufficient attention, concentration, attendance, and social skills, to maintain competitive full-time employment.[26]   The ALJ, however, gave such opinion evidence only "some" or "limited" weight, purportedly because it was not well supported and/or inconsistent with other evidence. On the other hand, the ALJ gave "great weight" to the opinion of a one-time consultative examiner, and "considerable weight" to the opinion of a non-examining agency review psychologist, purportedly because those opinions were consistent with the evidence overall.

The ALJ indicated that he considered the medical opinion evidence "in accordance with the requirements of 20 CFR 404.1527 and 416.927."[27]   The ALJ, though, did not explicitly mention the "treating physician rule," 20 CFR § § 404.1527(c)(2) & 416.927(c)(2), or purport to analyze that rule's so-called *Burgess* factors.[28]   Plaintiff maintains that the ALJ erred in this regard, since the evidence upon which he relied to assign weight to the various medical

---

[26]  *See*, Tr. 779-782, 977-978.

[27]  Tr. 18.

[28]  *See, e.g., Jane H. o/b/o Kenneth H. v. Comm'r of Soc. Sec.*, No. 1:20-CV-1539 (WBC), 2022 WL 17463727, at *3 (W.D.N.Y. Dec. 6, 2022) ("When assigning less than 'controlling weight' to a treating physician's opinion, the ALJ must 'explicitly consider' the four factors announced in *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008). *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019) (internal quotation marks omitted). Those factors, referred to as 'the *Burgess* factors,' are '(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.' *Estrella*, 925 F.3d at 95-96 (citation omitted); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).").

opinions was inadequate to support his findings.    The Court agrees that remand is required.

Plaintiff's claim was filed prior to March 27, 2017, meaning that the ALJ was required to follow the treating physician rule when evaluating the medical opinion evidence:

> For claims filed prior to March 27, 2017, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015). However, the opinion of a treating physician is not afforded controlling weight where the treating physician's opinion is contradicted by other substantial evidence in the record, such as the opinions of other medical experts. *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). In that situation, "'the ALJ must explicitly consider, *inter alia*: (1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist.'" *Greek*, 802 F.3d at 375 (*quoting Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013)); *see also* 20 C.F.R. § 404.1527(c). The ALJ must then "'comprehensively set forth [his or her] reasons for the weight assigned to a treating physician's opinion.'" *Id*. (*quoting Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)). "The failure to provide "'good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand.'" *Id*. (quotation omitted).

*Tina W. v. Comm'r of Soc. Sec.*, No. 5:22-CV-15 (MAD), 2023 WL 157952, at *6 (N.D.N.Y. Jan. 10, 2023).

Where an ALJ does not give a treating source's opinion controlling weight, the ALJ's subsequent failure to explicitly discuss the *Burgess* factors is a "procedural error," though the error may be deemed harmless if a "searching review of the record" assures the reviewing court that the substance of the treating physician rule was followed. *See, Hamilton v. Comm'r of Soc. Sec.*, No. 22-612-CV, 2023 WL 2395931, at *1–2 (2d Cir. Mar. 8, 2023) ("An ALJ's failure to explicitly apply the *Burgess* factors when assigning weight ... is a procedural error....

14

If, however, a searching review of the record assures us that the substance of the treating physician rule was not traversed, we will affirm.") (*quoting Estrella v. Berryhill*, 925 F.3d 90, 95–96 (2d Cir. 2019), other citation omitted).

Importantly, the requirement that the ALJ explicitly consider the *Burgess* factors is not satisfied by the ALJ merely referring to evidence relating to the factors. *See, Claudio-Montanez v. Kijakazi*, No. 21-2027, 2022 WL 17819123, at *3 (2d Cir. Dec. 20, 2022) ("[W]e cannot conclude that the ALJ's mere identification of Dr. Hogan as a podiatrist reflects that she recognized his special expertise when assessing the weight to give his opinions. Because the ALJ's decision is devoid of consideration, explicit or implicit, of the *Burgess* factors, our 'searching review of the record' does not assure us that she applied the substance of the treating physician rule, such that her error regarding Dr. Hogan was harmless."); *see also, Ferraro v. Saul*, 806 F. App'x 13, 15 (2d Cir. 2020) ("The Commissioner contends that the ALJ satisfied its burden with respect to this [*Burgess*] factor because it acknowledged that Talarico and Hammer had ongoing treatment relationships with Ferraro beginning in 2014.   But merely acknowledging the existence of treatment relationships is not the same as explicitly considering 'the frequency, length, nature, and extent of treatment.'").

As noted earlier, an ALJ's failure to articulate "'good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. In that regard, and despite the low bar ostensibly set by the substantial evidence standard, the Second Circuit has held that some evidence is insufficiently probative, and some reasons not "good" enough, to support giving less-than-controlling weight to a treating physician's opinion. *See, e.g., Rucker v. Kijakazi*, 48 F.4th 86, 92 (2d Cir. 2022) ("Here, none of the five reasons cited by the ALJ

provided a 'good reason' to discount Dr. Mirza's opinion.").

For example, the Second Circuit has held that it is error to reject a psychiatric opinion on the ground that it was based solely on the claimant's reports. *See*, *Rucker v. Kijakazi*, 48 F.4th at 92 ("Psychiatric testing is inherently based on subjective reports. A medical diagnosis will often be informed by the patient's subjective description of his or her symptoms.   That is all the more true in cases involving mental health, which tend to be less susceptible to objective testing and assessment.") (citation omitted).

Additionally, given the sometimes-fluctuating nature of mental health symptoms, it is error for an ALJ to find that a treating physician's opinion is inconsistent with the record based on isolated instances of improvement. *See*, *Rucker v. Kijakazi*, 48 F.4th at 94 ("The ALJ cited 'progress reports' in which [Dr.] Mirza described Rucker's mental status evaluations as normal. However, as the ALJ noted, these progress reports were not uniformly positive, and indeed were punctuated by episodes of hospitalization and suicidal ideation. Because a pattern of relative calm punctuated by manic episodes was consistent with Dr. Mirza's diagnosis of unspecified bipolar disorder, it was not permissible for the ALJ to 'cherry-pick' the positive aspects of the progress reports to discount Mirza's opinion as unsupported by the evidence.") (citation and internal quotation marks omitted).

Similarly, it may be error for an ALJ to discount the opinion of a treating physician based on the contrary opinion of a consultative expert who may have examined the claimant on one occasion or less, particularly in a case involving mental impairments, since the claimant's presentation on a particular day may not be indicative of the claimant's condition over time. *See, Ferraro v. Saul*, 806 F. App'x at 16 ("[T]he ALJ appears to have discounted the opinions

16

of Talarico and Hammer in part because they were inconsistent with the opinion offered by Dr.

Loomis. But we have frequently cautioned that ALJs should not rely heavily on the findings of

consultative physicians after a single examination, and we have noted that this concern is even

more pronounced in the context of mental illness where a one-time snapshot of a claimant's

status may not be indicative of her longitudinal mental health.   Here, in particular, the ALJ

seems to have given weight to Loomis's opinion because it supported a finding that Ferraro

was not disabled, rather than giving it weight because of its consistency with the underlying

medical evidence. And although the ALJ noted that Loomis's opinion was supported by that of

Dr. Hoffman, Hoffman did not examine Ferraro, and indeed seems to have formed an

assessment based in part on Loomis's notes.") (*citing Estrella*, 925 F.3d at 98; internal

quotation marks omitted); *but see, Grega v. Saul*, 816 F. App'x 580, 582–83 (2d Cir. 2020) ("A

consultative examiner's opinion may constitute substantial evidence if otherwise supported by

the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983). Here, Dr.

Brownfield's opinion was supported by and consistent with Grega's treatment records, test

results, and reported daily activities.").

Further, it is error for an ALJ to rely on his own medical judgment to decrease the

weight given to a medical opinion. *See, Claudio-Montanez v. Kijakazi*, 2022 WL 17819123, at

*3 ("We recognize an ALJ's role in resolving conflicts in the record, but in this instance the ALJ

improperly set her own judgment against that of a treating physician, as she does not cite to

medical opinions or other evidence establishing that the absence of these symptoms

undermines Dr. Hogan's opinions.   In addition, we have suggested that where an ALJ

determines, without medical evidence, that the absence of specific symptoms forecloses or

17

undermines a diagnosis, we have not hesitated to remand.") (citations omitted).

Lastly, and more generally, when considering medical evidence and other evidence, an ALJ is not permitted to "cherry pick" evidence that supports his RFC finding while ignoring other evidence that does not. *See, Bohart v. Astrue*, No. 10-CV-6503, 2011 WL 2516413, at *5 (W.D.N.Y. June 23, 2011) ("An ALJ cannot selectively choose the only portions of a medical opinion that support his determination, while ignoring others.") (citations omitted).

> Cherry-picking can be defined as "inappropriately crediting evidence that supports administrative conclusions while disregarding differing evidence from the same source." *Artinian v. Berryhill*, No. 16-cv-4404 (ADS), 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018). Cherry-picking can "indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both." *Id.* (quoting *Younes v. Colvin*, No. 1:14-cv-170, 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015)). But an allegation of cherry-picking is "seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014). Indeed, what a claimant may label as cherry-picking can often be described "more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009).

*Lisa T. v. Kijakazi*, No. 3:20-CV-1764 (SVN), 2022 WL 2207613, at *3 (D. Conn. June 21, 2022).[29]    Certainly, however, remand may be appropriate where a plaintiff demonstrates that an ALJ engaged in cherry picking or otherwise mischaracterized evidence. *See, Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 585 (S.D.N.Y. 2022) ("Courts frequently remand an ALJ's decision

---

[29] *See also, Estrella v. Berryhill*, 925 F.3d at 97 (Observing that some impairments, such as depression, may have symptoms that wax and wane, and that, "in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working. *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014); *see also Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days .... Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."). When viewed alongside the evidence of the apparently cyclical nature of Estrella's depression, the ALJ's two cherry-picked treatment notes do not provide 'good reasons' for minimizing Dr. Dron's opinion.").

when it ignores or mischaracterizes medical evidence or cherry-picks evidence that supports his RFC determination while ignoring other evidence to the contrary.").

In the instant case, applying all the foregoing principles, the Court first finds that the ALJ committed procedural error when, after not giving the treating medical opinions controlling weight, he failed to explicitly consider the *Burgess* factors.   For example, although the ALJ noted that Nobilski was a psychiatrist, and that she had treated Plaintiff "for some time" before rendering her opinion, such bare observations did not satisfy the ALJ's duty to explicitly consider either "the frequency, length, nature, and extent of treatment" or "whether the physician is a specialist."

Moreover, a "searching review" of the record does not assure the Court that the substance of the treating physician rule was followed here, since the ALJ appears to have committed some of the errors identified earlier.   For example, the ALJ appears to have relied on his own layman's interpretation of office treatment notes, and isolated instances of improvement therein, to find that Nobilski's opinion was inconsistent with the record.[30] Additionally, in assigning only "some weight" to Nobilski's opinion, the ALJ seems to have relied, in part, on the fact that Nobilski's opinion was inconsistent with the opinions of Hartman and Harding, who examined Plaintiff once and never, respectively.   As noted earlier, such practice is generally disfavored, particularly in cases such as this involving mental impairments

---

[30] Regarding Plaintiff's contention that the ALJ blatantly cherry-picked a few isolated instances of improvement, the Court observes that the argument is overstated, since, for example, the record does contain multiple treatment notes indicating that Plaintiff's symptoms were significantly improved as of July and August of 2017, after Plaintiff was off all medications for a year.   Indeed, notes from Nobilski and Jerome indicate that Plaintiff was unsure if she needed or wanted further treatment at that time.   However, the record also indicates that immediately thereafter Plaintiff began treating with Dr. Babiak, complaining of the same symptoms as before, and resuming her medications.   The Commissioner should attempt to explain this apparent inconsistency.

whose symptoms wax and wane. *See, Estrella*, 925 F.3d at 98 ("[T]he opinion of Dr. Christopher Flach, a one-time consultative psychologist, similarly does not provide a good reason for diminishing Dr. Dron's opinion.").

Consequently, the Court finds that remand is appropriate for the Commissioner to properly apply the treating physician rule, re-weigh the medical opinion evidence, and comprehensively set forth the reasons for the weight to be assigned. *See, Claudio-Montanez v. Kijakazi*, 2022 WL 17819123, at *2 ("[I]f the ALJ has not set forth 'good reasons' for assigning little weight to the treating physician's opinion, we cannot conclude that the error was harmless, and we must remand for the ALJ to 'comprehensively set forth its reasons.'") (citation omitted).

Moreover, the Court believes that it would be helpful for the Commissioner to explain the significance, if any, of the fact that the non-treating opinions of Hartman and Harding were issued in January 2017, without the benefit of the treatment notes from the rest of 2017 and 2018.   For that matter, the Commissioner should indicate exactly what records Hartman and Harding considered when forming their opinions.   Similarly, the opinions of Jerome and Nobilski were issued on July 28, 2017, and August 1, 2017, respectively, more than a year before the administrative hearing, and similarly without the benefit of the treatment records from the rest of 2017 and 2018.   Additionally, the opinions of Nobilski and Jerome were issued a year prior to the Summer of 2018, when Nobilski and Jerome reported that Plaintiff was claiming to be doing significantly better, despite not being on medication.   The Commissioner should address the significance, if any, of these facts in relation to the weight assigned to the opinions.

20

<u>The ALJ's Evaluation of the Medical Evidence and Plaintiff's Symptoms</u>

Plaintiff further maintains that the ALJ erred by drawing improper inferences from her performance certain limited activities of daily living.   Concerning this objection, it is error, for example, for an ALJ to find that a medical opinion is inconsistent with the record based on evidence that the claimant can perform certain activities of daily living that are not necessarily indicative of greater ability to work than what the medical provider found. *See, Rucker v. Kijakazi*, 48 F.4th at 93 ("Rucker's ability to attend counseling sessions—in which she is receiving treatment to alleviate her symptoms—has no bearing on her ability to attend work. Unlike a physician's office, work is a different, more stressful environment for Rucker in which her psychiatric triggers are exacerbated by co-worker interaction and the need to respond appropriately to supervision."); *see also, Claudio-Montanez v. Kijakazi*, 2022 WL 17819123, at *3 ("[T]he ALJ's reliance on some of Claudio-Montanez's activities, such as cooking, cleaning, doing laundry, shopping, enrolling in school, or caring for her mother is misplaced. Substantial evidence does not support the ALJ's finding that Claudio-Montanez's daily activities are inconsistent with the above restrictions Dr. Hogan recommended.") (citations omitted); *id* at *6 ("Preparing meals and tending to one's personal care are markedly different than working full-time, and Claudio-Montanez has explained the limited nature of these tasks. Indeed, we have repeatedly recognized that engaging in basic activities necessary to one's welfare is markedly different from working full-time.") (citation omitted); *but see, Medina v. Comm'r of Soc. Sec.*, 831 F. App'x 35, 36 (2d Cir. 2020) ("The ALJ's decision not to afford Shah's opinion controlling weight as the treating physician is well-supported by the record, which contains notes showing Medina's improved mood and her ability to independently

21

manage reported activities of daily life, including tasks such as cooking, cleaning, self-care, banking, shopping and driving without assistance.   . . .   The ALJ noted that Medina regularly volunteered at a dog shelter, and that she engaged in many activities requiring concentration and the ability to stay on task, including driving, cleaning, doing laundry, cooking, and shopping. The ALJ noted that these activities required many of the same functions that the claimant alleges she is unable to perform in a work setting.   Based on this record, we find the ALJ's conclusions to be substantially supported.") (citation to record omitted).

In this action, the ALJ relied on Plaintiff's activities to draw inferences negative to her. For example, at the third step of the sequential evaluation, the ALJ relied on the fact that Plaintiff was enrolled in cosmetology school to conclude that she did not have a listed impairment.   However, the ALJ did not explain the significance of Plaintiff's mere enrollment in a class.   Nor did the ALJ address Plaintiff's testimony that she was unable to maintain her hours at the cosmetology school, or that she stopped attending when she went to a psychiatric center for treatment. (Tr. 61-62).   That was error. *See, Claudio-Montanez v. Kijakazi*, 2022 WL 17819123, at *4 ("[A]s it relates to Claudio-Montanez's school-related activities, there is scant evidence of the length of Claudio-Montanez's classes, the duration she regularly remained seated, and whether she elevated her feet.   So, the ALJ's inference that her enrollment in school is inconsistent with Dr. Hogan's restrictions relies on speculation."); *see also, id*. at *6 ("The ALJ's reliance on Claudio-Montanez's school attendance also does little to contradict the treating physicians' opinions, as the record lacks evidence that would give such an activity the significance the ALJ gives it. The ALJ finds that Claudio-Montanez's attendance at school required her 'sustained attention, concentration, and good attendance.'   However, the record

22

does not provide any support for 'good attendance.'   And even if Claudio-Montanez had

perfect attendance, because the record does not include evidence of Claudio-Montanez's class

schedule or course-load, the demands of such activity cannot be compared to the demands of

a full-time work schedule.   Moreover, there is no evidence in the record to establish Claudio-

Montanez's success in concentrating during her classes or while completing her assignments

such that her enrollment in classes would undermine her treating physicians' opinions. For that

reason, Claudio-Montanez's school attendance does not undermine her treating physicians'

opinions that if Claudio-Montanez were required to maintain a full-time schedule, she would be

significantly off-task and frequently absent.") (citations omitted).

   Upon remand, to the extent the Commissioner intends to rely on Plaintiff's performance

of activities of daily living as proof of a particular fact, the Commissioner must explain how

such activities relate to the finding.

   Plaintiff additionally contends that the ALJ drew improper inferences from her

noncompliance with treatment, and failed to comply with SSR 16-3p.   In that regard, it is error

for an ALJ to rely on a claimant's lack of treatment, or noncompliance with treatment

recommendations, to find that the claimant's impairments are not as severe as claimed,

without first considering possible reasons for such noncompliance or lack of treatment:

> [I]f the frequency or extent of the treatment sought by an individual is not
> comparable with the degree of the individual's subjective complaints, or if the
> individual fails to follow prescribed treatment that might improve symptoms, we
> may find the alleged intensity and persistence of an individual's symptoms are
> inconsistent with the overall evidence of record. *We will not find an individual's
> symptoms inconsistent with the evidence in the record on this basis without
> considering possible reasons he or she may not comply with treatment or seek
> treatment consistent with the degree of his or her complaints.* We may need to

contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints. When we consider the individual's treatment history, we may consider (but are not limited to) one or more of the following:

· An individual may have structured his or her activities to minimize symptoms to a tolerable level by avoiding physical activities or mental stressors that aggravate his or her symptoms.

· An individual may receive periodic treatment or evaluation for refills of medications because his or her symptoms have reached a plateau.

· An individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms.

· An individual may not be able to afford treatment and may not have access to free or low-cost medical services.

· A medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual.

· An individual's symptoms may not be severe enough to prompt him or her to seek treatment, or the symptoms may be relieved with over the counter medications.

· An individual's religious beliefs may prohibit prescribed treatment.

· Due to various limitations (such as language or mental limitations), an individual may not understand the appropriate treatment for or the need for consistent treatment of his or her impairment.

· Due to a mental impairment (for example, individuals with mental impairments that affect judgment, reality testing, or orientation), an individual may not be aware that he or she has a disorder that requires treatment.

· A child may disregard the level and frequency of treatment needed to maintain or improve functioning because it interferes with his or her participation in activities typical of other children his or her age without impairments.

The above examples illustrate possible reasons an individual may not have pursued treatment. *However, we will consider and address reasons for not pursuing treatment that are pertinent to an individual's case. We will review the case record to determine whether there are explanations for inconsistencies in the individual's statements about symptoms and their effects, and whether the evidence of record supports any of the individual's statements at the time he or she made them*. We will explain how we considered the individual's reasons in our evaluation of the individual's symptoms.

Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims, SSR 16-3P (S.S.A. Oct. 25, 2017) (emphasis added).

In the ALJ's decision, he concluded that, "Overall, the medical evidence does not fully support the claimant's allegations," and in making that finding, stated, in pertinent part: "[T]he record indicates several interruptions in the claimant's treatment, including poor therapy and psychiatric attendance.   The record also indicates some periods without medication." (Tr. 21). The ALJ noted that there were some possible reasons for Plaintiff's poor compliance with medication, though he did not similarly explore possible reasons for her poor attendance at appointments. (Tr. 21).

The record indicates that Plaintiff frequently missed therapy appointments, and, indeed, Jerome and Nobilski threatened to, and later did, terminate Plaintiff as a patient for that reason. (Tr. 815).   However, Jerome also noted that Plaintiff claimed not to know that she had missed so many appointments, and that Plaintiff struggled with keeping appointments in general due to her mental health symptoms. (Tr. 815) ("She has not been seen since April and

has been placed on an attendance contract.   Client indicated she did not realize she had
missed so much or not been seen in so long.   . . . Client struggles with daily living skills
including remembering appts[.]").

The record also indicates that Plaintiff sometimes did not take her mental health
medications.   However, the record further states that Plaintiff often received no benefit from
medications or had bad side effects. (Tr. 802) ("Client would be [an] excellent candidate for
genetic testing for determination of medication due to number of medications being tried and
not working or having medical complications (sight problems, etc.).")); *see also*, (Tr. 806)
("Patient . . . appears to be sensitive to serotonergic agents.   . . .   She has been on numerous
medications[.]"); (Tr. 50) ("I was off medicines due to them wanting me to see if I could find out
if there was another reason why I was med-resistant[.]"); (Tr. 51) (Taken off mental health
medications that caused blackouts); (Tr. 809) ("[H]as been having a difficult time with negative
side-effects of medication including passing out and temporary blindness."); (Tr. 901) (Unable
to use mood stabilizers due to neurological concerns); (Tr. 952) (Plaintiff unilaterally reduced
dosage of Risperdal due to heavy menses on prescribed dosage).   Also, doctors were
reluctant to provide Plaintiff with certain medications for fear that she would use them to
overdose. (Tr. 821, 829, 830-831).   Plaintiff has also expressed problems with insurance and
difficulty paying for certain medications. (Tr. 810, 812, 816, 821, 822, 934) (Difficulty with
insurance paying for medication.).

Upon remand, to the extent the Commissioner may wish to draw any negative inference
from Plaintiff's non-compliance with treatment, the Commissioner should first consider the
possible reasons for such non-compliance, consistent with SSR 16-3p.

26

Development of the Record

As discussed earlier, the record is missing several months of treatment records from psychiatrist Dr. Babiak.   Plaintiff's counsel was apparently supposed to submit the records within fourteen days after the hearing, but never did so, whereupon the ALJ closed the record and issued a decision, though not until nine months after the hearing.

In this action, the Court does not recall either party addressing this point.   However, regardless of whether the ALJ had a strict duty to develop the record under these circumstances,[31] it clearly would have been important to have those records from Babiak. Indeed, the ALJ noted that Plaintiff's condition improved significantly during 2018, to the point that by the Summer of 2018 she had stopped taking all medication and was reporting significant improvement in symptoms.   (Tr. 20-21) ("The evidence had also suggested periods of stability even without medication, with the claimant stating in July 2018 that she could function independently and was more stable than she had been in years.").   Indeed, notes from Nobilski and Jerome indicate that Plaintiff reported significant improvement in or about July-September 2018, while Plaintiff was not taking any medications, and that Plaintiff, who had expressed doubt as to whether she needed continued treatment, was discharged from treatment in October 2018 after failing to appear for scheduled appointments. (Tr. 876, 856).[32]

However, upon leaving treatment with Nobilski and Jerome, Plaintiff began treating with Babiak, who placed her back on medications in response to Plaintiff's complaints of continuing

---

[31]Given the non-adversarial nature of disability hearings, "the ALJ's general duty to develop the administrative record applies even where the applicant is represented by counsel, but the agency is required affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record." *Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) (quoting Rosa v. Callahan, 168 F.3d 72, 79 & n. 5 (2d Cir.1999)).

[32]  Although, as of March 2018 Plaintiff was still complaining of symptoms. (Tr. 886).

symptoms. (Tr. 978).   Moreover, at the hearing Plaintiff essentially testified that she switched to treating with Babiak because Nobilski and/or Jerome were not providing her with adequate treatment. (Tr. 48-50).   Also, at the hearing, Plaintiff maintained that her symptoms had not improved. (Tr. 34).   The ALJ did not follow up on this testimony. (Tr. 42).   Additionally, Plaintiff's counsel failed to submit additional records to the ALJ, and the ALJ closed the record two weeks after the hearing. (Tr. 13, 72).

Consequently, there is clearly a gap in the record concerning Dr. Babiak's treatment and Plaintiff's condition during the Fall of 2018.   On remand, the Commissioner should obtain the missing records. *See, e.g., Meegan v. Berryhill*, No. 1:16-CV-00187 (MAT), 2017 WL 1829729, at *3 (W.D.N.Y. May 7, 2017) ("Contrary to the ALJ's apparent conclusion, counsel's failure to secure the requested documentation did not absolve the ALJ from his independent duty to develop the record in this non-adversarial proceeding.") (*citing Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).

<u>Consideration of a Closed Period of Disability</u>

Plaintiff's reply brief argues that to the extent the Commissioner is claiming that Plaintiff did not need treatment after July 2018, then the ALJ "failed to consider whether Plaintiff was entitled to a closed period of benefits up and through any claimed date of improvement."[33]

In certain instances, an ALJ is expected to consider a closed period of disability benefits:

"A closed period of disability refers to when a claimant is found to be disabled for a finite period of time which started and stopped prior to the date of the administrative decision granting disability status." *Pettaway v. Colvin*, 12-CV-2914 (NGG), 2014 WL 2526617 at *13 (E.D.N.Y. June 4, 2014) (quotation omitted). When deciding a disability claim, "if a claimant is disabled at any point in time, the

---

[33] Pl. Reply Brief, ECF No. 17 at p. 6.

ALJ should consider not only whether Plaintiff was disabled at the time of the hearing, but also whether Plaintiff was entitled to disability benefits for any closed, continuous period of not less than 12 months, following the date of [her] claim." *Williams v. Colvin*, No. 15-CV-144S, 2016 WL 3085426, at *4 (W.D.N.Y. June 2, 2016). "It is particularly necessary for the ALJ to consider whether a closed period of disability existed where the record shows that plaintiff's condition has improved significantly over time as the result of a discrete event, such as surgery." *Robertson v. Berryhill*, No. 6:16-CV-06481 (MAT), 2017 WL 3574626, at *2 (W.D.N.Y. Aug. 18, 2017).

*Sandra Lee M. v. Comm'r of Soc. Sec.*, 541 F. Supp. 3d 277, 283 (W.D.N.Y. 2021) (Wolford, J.).

In accordance with the foregoing relevant principles, if upon remand the Commissioner maintains that Plaintiff's condition improved significantly at some point during the relevant period, then the Commissioner should consider whether Plaintiff is entitled to a closed period of disability.

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 14) for judgment on the pleadings is granted, Defendant's cross-motion (ECF No. 16) for the same relief is denied, and the matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order, pursuant to sentence four of 42 U.S.C. § 405(g).

So Ordered.

Dated: Rochester, New York
       March 30, 2023

                              ENTER:


                              CHARLES J. SIRAGUSA
                              United States District Judge